IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KARI MATRAI and
KENNY MATRAI,

                        Plaintiffs

            vs.                                    Case No. 14-2022-SAC

DIRECTV, LLC,

                        Defendant.


MEMORANDUM AND ORDER

            The case comes before the court on the defendant DirecTV, LLC's

("DirecTV") motion for summary judgment (Dk. 67) and on the plaintiffs Kari

and Kenny Matrai's motion for partial summary judgment (Dk. 70). The

plaintiffs are husband and wife and equal owners of K+K Outfitters ("K+K").

The plaintiffs did satellite television installations for DirecTV as part of the

following arrangement. DirecTV through a service provider agreement

("SPA") contracted some of its Topeka installation work to Quest Integrated

Systems, Inc. ("Quest"), and Quest through a separate agreement

subcontracted this work to AM Entertainment LLC ("AME"), and AME

contracted with the plaintiffs through an installer agreement which Kenny

Matrai signed on behalf of K+K. (Dk. 66, Pretrial Order, Stipulations, pp. 1-

2). As set forth in the pretrial order, the individual plaintiffs allege they were

employees for the joint employers, DirecTV and its subcontractors, Quest

and AME, under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et*

*seq.* They claim entitlement to unpaid overtime compensation from DirecTV for this FLSA violation.

DirecTV moves for summary judgment arguing that the plaintiffs were independent contractors of AME and so they are unable to prove they were employees of DirecTV and are not entitled under the FLSA to overtime compensation. DirecTV alternatively argues that the plaintiffs are exempt commissioned employees in a retail or service establishment and that the plaintiffs are pursuing some damages unrecoverable under FLSA. The plaintiffs also have filed a motion seeking partial summary judgment on the issue that they both were employees of DirecTV entitled to both minimum wage and overtime compensation. The plaintiffs say the issues of law are sharply contested but the facts underlying them are undisputed. In contrast, the defendant's contend the plaintiff's motion misstates and misconstrues the record and lacks the facts to sustain their legal positions. The court finds the factual record to be disputed so as to prevent a summary judgment ruling on whether the plaintiffs were employees of DirecTV. The factual record, however, is not disputed on the defendant's alternative exemption argument. The court grants summary judgment for the defendant based on the retail and service establishment exemption for commissioned employees.

**SUMMARY JUDGMENT STANDARDS**

"Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is

entitled to judgment as a matter of law.'" *Tolan v. Cotton*, ---U.S.---, 134 S. Ct. 1861, 1866 (2014)(quoting Fed. R. Civ. P. 56(a)). At the summary judgment stage, the court is not to be weighing evidence, crediting some over other, or determining the truth of disputed matters, but only deciding if a genuine issue for trial exists. *Id*. The court performs this task with a view of the evidence that favors most the party opposing summary judgment. *Id.* "Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). At the same time, with the filing of cross-motions, the court is "entitled to assume that no evidence needs to be considered other than that filed by the parties but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

**STIPULATIONS OF FACTS**

In the pretrial order, the parties have stipulated to the following facts. During the time period relevant to this action, 2010 through 2013, DirecTV had a SPA with Quest covering a portion of DirecTV's installation work in Topeka and surrounding areas. The SPA made Quest "responsible for 'provid[ing] at its own expense, all office space and supplies, office overhead (such as telephone, copier and facsimile expense), labor, skills, tools and other equipment and personnel necessary for it to perform the

[installations].'" (Dk. 66, Pretrial Order, p. 2). By a separate agreement, Quest subcontracted this work to AME.

Answering an advertisement for installers that AME posted on the internet, Kenny Matrai telephoned and later met with Jeremy Knighton, an AME tech supervisor, and was told "about the technical requirements and certifications that were necessary for the work." *Id.* AME trained the Matrais for this installation work which included observing Knighton and another technician on the job. AME instructed the Matrais on completing installations and arranged for their receipt of the necessary certifications for this work.

On January 13, 2011, Kenny Matrai executed the installer agreement with AME and signed it on behalf of K+K. Kenny and his wife, Kari, are "'like 50/50 owners' of K+K." *Id.* at 3. Kari did the "book work" for K+K. The agreement required K+K to have its own insurance, and the Matrais obtained a liability insurance policy for K+K and renewed it through June of 2015. There also were provisions governing the parties' termination of the agreement. Kenny Matrai signed a document describing, "Quest's requirements for contacting customers and dispatch regarding installation appointments and for completing and turning in paperwork to get paid." *Id.*

When signing the installer agreement, Kenny Matrai initialed paragraphs that required K+K "'to provide and pay for all materials, tools and equipment;' to obtain the necessary certifications to do the work; and to be responsible for 'all applicable taxes.'" *Id.* He also initialed a provision that

said, "the agreement was 'for independent contracting services' and that 'the contracting party provides no benefits . . . .'" *Id.* The Matrais have stipulated that, they "initially believed that they were independent contractors." *Id.*

AME provides "DirecTV with necessary information about the technician's schedule, geographic area of work, and skill set (i.e. information on certifications and specialized skills) and requests a tech number for the technician." *Id.* DirecTV issued tech numbers to both Kari and Kenny Matrai, and these numbers are used to indicate that, "the installer is authorized to do DirecTV installations." *Id.*

In doing installation work for DirecTV, the Matrais drove themselves to the customer appointments and completed the work using their own vehicle and tools pursuant to the installer agreement with AME. The Matrais completed their installation work orders without anyone else accompanying them in the vehicle or on the worksite.

AME paid the Matrais for the completed installation work orders. On a weekly basis, AME sent information of its completed work orders to Quest, and Quest would compile the information of its completed work orders and send that to DirecTV who wired weekly payments to Quest "for the aggregate, completed work orders." *Id.* at 4. Quest, in turn, paid AME for those work orders completed by AME. "DirecTV did not issue paychecks, paystubs, W-2s, or 1099s to the Matrais," and it "did not maintain personnel files, payroll records, performance evaluations, or benefits information, for

the Matrais." *Id*. The court reserves its discussion of other facts, controverted and not, used in the evaluation of different factors and elements under FLSA law.

**FLSA ANALYSIS**

The FLSA creates a cause of action against employers who violate the overtime compensation and/or minimum wage requirements mandated in the Act. An "employer" subject to the FLSA is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee...." 29 U.S.C. § 203(d). An "employee" is defined as "any individual employed by an employer." § 203(e)(1). The FLSA "defines the verb 'employ' expansively to mean, 'suffer or permit to work.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (quoting 29 U.S.C. § 203(g). Concerning a joint-employer relationship, one court offers this summary of the law:

> The DOL, the regulatory body responsible for enforcing the FLSA, has enacted regulations outlining when multiple parties may be jointly liable under the FLSA due to the existence of a joint-employer relationship. See 29 C.F.R. § 791.2. Since Congress has not directly addressed the issue of when a joint-employer relationship exists, and since the regulations enacted by the DOL are based on a permissible reading of the FLSA, this Court grants deference to the DOL's regulations. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). . . . The regulation states:
>
> > [A] joint employment relationship generally will be considered to exist in situations such as: [ … ] Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or [ … ] Where the employers [ … ] may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one

> employer controls, is controlled by, or is under common control
> with the other employer.
>
> 29 C.F.R. § 791.2. These regulations are broad and demonstrate intent
> to impose broad liability under the FLSA on both organizations and
> officers. According to these regulations, if one employer is acting in the
> interest of another, or if one employer is controlled by another, a joint-
> employer relationship exists, and "all joint employers are responsible,
> both individually and jointly, for compliance with all of the applicable
> provisions of the act." *Id.* . . . Therefore, the level of control an
> organization or individual has over the employees is central in
> determining employer status.

*Harris v. Universal Contracting, LLC*, 2014 WL 2639363, at *5 (D. Utah Jun.

12, 2014); *see Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 917 (9th Cir.

2003), *cert. denied*, 541 U.S. 1030 (2004).

"The 'striking breadth' of these definitions 'stretches the meaning

of "employee" to cover some parties who might not qualify as such under a

strict application of traditional agency principles.'" *Johnson v. Unified*

*Government of Wyandotte County/Kansas City, Kansas*, 371 F.3d 723, 729

(10th Cir. 2004) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. at

326). The Tenth Circuit has concluded:

> Thus, in determining whether an individual is covered by the FLSA,
> "our inquiry is not limited by any contractual terminology or by
> traditional common law concepts of 'employee' or 'independent
> contractor.'" *Henderson v. Inter–Chem Coal Co., Inc.*, 41 F.3d 567,
> 570 (10th Cir. 1994) (citing *Dole v. Snell*, 875 F.2d 802, 804 (10th Cir.
> 1989)). Instead, the economic realities of the relationship govern, and
> "the focal point is 'whether the individual is economically dependent on
> the business to which he renders service . . . or is, as a matter of
> economic fact, in business for himself.'" *Id.* The economic reality test
> includes inquiries into whether the alleged employer has the power to
> hire and fire employees, supervises and controls employee work
> schedules or conditions of employment, determines the rate and
> method of payment, and maintains employment records. *Watson v.*
> *Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990).

7

In applying the economic reality test, courts generally look at (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business. *Henderson*, 41 F.3d at 570. In deciding whether an individual is an employee or an independent contractor under the FLSA, a district court acting as the trier of fact must first make findings of historical facts surrounding the individual's work. Second, drawing inferences from the findings of historical facts, the court must make factual findings with respect to the six factors set out above. Finally, employing the findings with respect to the six factors, the court must decide, as a matter of law, whether the individual is an "employee" under the FLSA. *Id.* at 571. None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach. *Id.* at 570.

*Baker v. Flint Engineering & Const. Co.*, 137 F.3d 1436, 1440-41 (10th Cir. 1998).

Applying these or similar principles on whether cable installers are FLSA "employees," courts across the nation have reached varying results both at the summary judgment stage and after a bench trial. A federal district court recently summarized some of these results:

In FLSA cases, similar issues have been addressed by a number of courts with varying results. Following bench trials, the court in *Solis v. Cascom, Inc.*, 3:09CV257, 2011 WL 10501391, (S.D. Ohio Sept. 21, 2011) held that cable installers were employees under the FLSA, and the court in *Parrilla v. Allcom Const. & Installation Services, LLC*, 6:08–cv–1967–Orl–31GJK, 2009 WL 2868432 (M.D. Fla. Aug. 31, 2009) held that cable installers were independent contractors exempt from the FLSA. Some courts faced with motions for summary judgment on the issue of whether cable installers are employees under the FLSA or independent contractors exempt from the FLSA have found that substantial factual disputes precluded summary judgment. *See Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308 (11th Cir. 2013); *Lang v. DirecTV, Inc.*, 801 F.Supp.2d 532 (E.D.La. 2011); *Keeton v. Time Warner Cable, Inc.*, 2:09–CV–1085, 2011 WL 2618926 (S.D.

Ohio July 1, 2011); *Muller v. AM Broadband, LLC*, 07–60089–CIV, 2008 WL 708321 (S.D.Fla. March 14, 2008); *Santelices v. Cable Wiring*, 147 F.Supp.2d 1313 (S.D.Fla. 2001). Other courts have granted summary judgment finding that cable installers were independent contractors based on the particular facts of those cases. *See Keller v. Miri Microsystems, LLC*, 12–15492, 2014 WL 1118446 (E.D.Mich. March 20, 2014); *Bennett v. Unitek Global Services, LLC*, 10C4968, 2013 WL 4804841 (N.D.Ill. Sept. 9, 2013); *Scruggs v. Skylink, Ltd.*, 3:10–0789, 2011 WL 6026152 (S.D.W.Va. Dec. 2, 2011); *Chao v. Mid–Atlantic Installation Services, Inc.*, 16 Fed.Appx. 104 (4th Cir. 2001); *Herman v. Mid–Atlantic Installation Services, Inc.*, 164 F.Supp.2d 667 (D.Md. 2000). It is clear from the foregoing cases that the analysis is fact intensive and each court must make the determination as to the employment relationship on the particular facts before them.

*Thornton v. Mainline Communications, LLC*, ---F. Supp. 3d---, 2016 WL 228897, at *4 (E.D. Mo. Jan. 19, 2016). The *Thornton* decision represents another line of decisions which have granted partial summary judgment for the cable installer plaintiff upon finding an employer/employee relationship from the undisputed facts. *See also Perez v. Lantern Light Corp.*, 2015 WL 3451268 (W.D. Wash. May 29, 2015) (Summary judgment for the Department of Labor (suing on behalf of 82 cable installers who had worked for a subcontractor who had a SPA with DirecTV) upon finding that DirecTV was a joint employer of the cable installers). This list also needs to be updated in that the *Keller* decision was vacated by the Sixth Circuit in 2015, and it is now one more decision which denies summary judgment upon finding a genuine issue of material fact over whether the cable installer plaintiff is an employee or independent contractor. *Keller v. Miri Microsystems LLC*, 781 F.3d 799 (6th Cir. 2015). The court adds one more

decision to the list of those denying summary judgment. *Pennington v. Integrity Communications, Inc.*, 2014 WL 2106301, at *4 (E.D. Mo. May 20, 2014).

A close look at the facts presented in the parties' motions reveals there to be some genuinely disputed factual issues and contested inferences that preclude summary judgment on the employee/independent contractor question. Moreover, the parties plainly disagree over which facts and inferences are material in weighing the individual factors under the economic reality test. Their briefs are replete with efforts at disputing the inferences, characterizations, and significance behind the parties' respective factual statements. The court is satisfied that this case is not suited for summary judgment on this issue. To support this conclusion, the court will identify and discuss just a few of the disputed facts underlying only some of the relevant inquiries and factors.

## Degree of Control

This factor is described as the degree of control that the alleged employer exerted over the alleged employee. In this respect, the economic reality test asks the court's inquiry to include "whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records." *Baker*, 137 F.3d at 1440. The court looks at the plaintiff's "independence over setting their work

hours, . . ., and other details of their . . . work." *Id.* at 1441. The court

considers whether the plaintiff is acting independently or autonomously, as if

conducting his or her own business, as reflected in reporting to work, in

deciding what work to do, in doing work according to the plaintiff's schedule,

and in being able to do third-party work projects at the same time. *Id.* Put

another way, "[c]ontrol is only significant when it shows an individual exerts

such a control over a meaningful part of the business that she stands as a

separate economic entity." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308,

1313 (11th Cir. 2013); *Eberline v. Media Net, LLC*, --- Fed. Appx. ---, 2016

WL 279092 at *2 (5th Cir. Jan. 21, 2016).

        Each side offers a contrasting story on this factor. DirecTV

describes its control over the plaintiffs as merely its effort to impose some

quality control procedures and explains them as qualitatively different from

an employer exercising control over an employee. DirecTV brings under this

quality control umbrella such things as assigning tech numbers; setting

standards and giving instructions for customer relations and installation

work; having installers contact DirecTV when heading to a job, arriving at it

and completing the job; and requiring technicians to wear shirts, caps and

badges bearing the DirecTV logo. The defendant seeks to distant itself from

interacting with the contract installers by characterizing its instructions,

demands and requirements as made to Quest or AME who then would direct

as necessary and appropriate. In this way, the defendant is trying to avoid

responsibility for its decisions impacting the installers by deferring to the implied discretion of the subcontractors Quest and AME to implement and supervise the installers. DirecTV also singles out those court decisions which have granted summary judgment against the cable installers and draws some parallels with the facts in those decisions. The plaintiffs argue in contrast that the same evidence indicates employer control over their decisions regarding their assignments, schedules, and performance. They also present evidence of their testimony given and emails received that the DirecTV operations managers may have imposed and communicated requirements that went beyond the semblance of mere quality control. Thus, the court is convinced that the facts material to the issue of control are disputed and that neither side is entitled to judgment as a matter of law on this issue.

In looking at whether technicians were able to conduct their businesses as independent contractors, the courts look at what control they had over choosing, scheduling, rescheduling, and completing the work orders. According to DirecTV, it initially generated work orders each day for the different tech numbers assigned to individual technicians, but it relied on the Quest/AME to actually assign the work orders to the different technicians. DirecTV's position is also that it handled same day work orders by contacting Quest/AME to determine if any technicians were available to handle these additional work orders.

The plaintiff's evidence offers a different view of this. This comes from the plaintiff's testimony and from emails sent by DirecTV's operations manager to Quest and AME, some of which were directly forwarded to the plaintiffs. From their working experience, the plaintiffs understood that the routing of orders was done principally by DirecTV managers, Paul Miller or Brian Page. DirecTV required from its subcontractors that all contracting technicians acknowledge their assigned worked orders and set their "ETA's" by 8:00 a.m. each day. DirecTV similarly required that no contracting technician reschedule, put on hold, or cancel a job without prior approval through a three-way conference call with their supervisor and a DirecTV manager. DirecTV communicated that it was the only party who could decide whether a job would go on hold, be rescheduled, or be canceled. One such DirecTV email forwarded to the plaintiffs threatened that "[a]ny tech" canceling a new installation order without prior approval would "be brought in to see" the DirecTV manager. (Dk. 71-1, p. 6). Another DirecTV email forwarded to the plaintiffs expected each contracting technician to complete at least three jobs per day and stated the following as to the workweek:

> It needs to be critically emphasized to the contractors of Quest that by giving the opportunity to work a 5 day work day is not normal but that is a privilege to the hard work done by them and that I the Site Manager have extended a gracious hand at accommodating the contractors request. I have given out the 5 days to only one contractor (the Matrai Team) in 3 years as Supervisor/Manager. We must continue to keep in our minds that this is a business. When it gets busy we have to work harder at our jobs than normal.

(Dk. 71-1, p. 12).[1] And yet another DirecTV email spoke about the installation work being a team effort and referred to the contracting technicians as part of the team. (Dk. 71-1, p. 4). Finally, the evidence of record is unclear on whether the plaintiffs did or could have done third-party work projects at the same time they were completing at least three installations each day for five days a week. While the defendant denies any direct and immediate control over the technicians, the plaintiff's evidence certainly disputes these matters as to prevent summary judgment here.

<u>Power to Hire and Fire</u>

The plaintiffs point to DirecTV's hiring power in setting technician requirements for training, certification, drug screening, and criminal background checks. The plaintiffs also contend that DirecTV had the power to terminate installers by no longer routing job orders to that contracting technician's tech number. DirecTV emails threatened that a tech number would "no longer be routed for us" or would "be shut off" if a job was

---

[1] With regard to these emails, the defendants repeatedly object to lack of foundation. "Discretionary authority over the admission or exclusion of evidence on summary judgment lies with the district court." *Roe ex rel. Roe v. Keady*, 329 F.3d 1188, 1194 (10th Cir. 2003). All of the proffered emails share distinctive and common characteristics in terms of the names, email addresses, discussion of identifiable content, logos and titles. "The distinctive characteristics of the emails suggest that they are what they purport to be and thus are sufficiently authenticated for consideration at summary judgment." *Rowe v. DPI Specialty Foods, Inc.*, 2015 WL 3533844, at n.28 (D. Utah. Jun. 4, 2015). As for the defendant's hearsay objections, it would appear that Miller as operations manager for DirecTV sent these emails to contractors on a matter within the scope of his employment and while he was employed. Fed. R. Evid. 801(d)(2). The defendant has not shown that these emails meet the definition of hearsay.

rescheduled or cancelled without prior approval. (Dk. 71-1, pp. 2-3). Kenny Matrai's work as a DirecTV installer ended when he received from Quest an email stating that DirecTV had decided to no longer route his tech number and that the "[r]easons given were a steady decline in customer satisfaction and jobs being cancelled or rescheduled with no communication back to the local office." (Dk. 71-1, p. 17). The defendant denies that this is what happened here citing the testimony of its operations manager and further denies having this power or authority to hire or fire. The evidence here is controverted as to who decided what with regards to the hiring/firing determinations and to what was known and expected to happen when jobs were no longer routed to an assigned tech number. The court is satisfied that genuine issues of material fact impact this factor.

Permanence of Relationship

"Generally, independent contractors have variable or impermanent working relationships with the principal company because they 'often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas "employees" usually work for only one employer and such relationship is continuous and indefinite in duration.'" *Keller*, 781 F.3d at 807 (quoting *Baker*, 137 F.3d at 1442). Courts consider "the length and regularity of the working relationship between the parties" while recognizing that "even short, exclusive relationships" point toward an employment relationship. *Id.* The undisputed evidence is that

beginning in January of 2011 through April of 2013, the Matrais did installation work for DirecTV. While it's true that there was no actual contractual relationship between DirecTV and the Matrais, courts do not regard contractual intent as dispositive and, instead, understand the FLSA to be "designed to defeat rather than implement contractual arrangements." *Keller*, 781 F.3d at 808 (internal quotation marks and citation omitted). The court finds a material dispute over whether Matrais and DirecTV had an exclusive working relationship and whether the Matrais could have worked other jobs during their time with DirecTV. The plaintiffs can point to the lengthy working relationship and DirecTV's control over their jobs and schedule, and DirecTV points to the availability of other work for the plaintiffs through their contract with AME.

Worker's Opportunity for Profit or Loss

The plaintiffs contend they were paid compensation on a piece-rate basis that was essentially fixed by the installation job rates set by DirecTV. The plaintiffs say they had no opportunity to negotiate their compensation. And because they worked full time for DirecTV, the plaintiffs say their livelihood depended on this working relationship. The defendant denies having any role or involvement in determining the rate of payment for the Matrais as AME installers. The defendant again distances itself from controlling the Matrais' work schedule by relying on the contractual relationships with Quest and AME that separated them. The court is satisfied

there are factual disputes on control, DirecTV's influence on the rate of pay, and the existence of a "full time" working relationship.

The court will not extend this order by addressing the other factors, because the factual disputes discussed above are substantial and present genuine and material issues that preclude a summary judgment order on whether the plaintiffs were employees under the FLSA. The court concludes that a factfinder could reasonably find the plaintiffs were or were not employees, and that the weight appropriately afforded the different factors would be best assessed at a trial where all the circumstances in their entirety are presented. *See Keller*, 781 F.3d at 816.

**FLSA EXEMPTION FOR RETAIL OR SERVICE ESTABLISHMENT**

The defendant alternatively seeks summary judgment based on the FLSA's exemption in § 207(i) for a commissioned employee in a retail or service establishment. In the pretrial order, the Matrais allege they are "not exempt from FLSA minimum wage and overtime requirements under 29 U.S.C. § 207(i)" exemption, because "DirecTV is not a retail or service establishment" and because they "did not earn any compensation from commissions." (Dk. 66, p. 10). The statutory elements of this exemption are:

> No employer shall be deemed to have violated subsection (a) of this section by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a

representative period (not less than one month) represents commissions on goods or services.

29 U.S.C. § 207(i). Applying an exemption "is a mixed question of law and fact." *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010), *cert. denied*, 132 S. Ct. 368 (2011). "'The question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law.'" *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558 (2d Cir. 2012) (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).

As the alleged employer, the defendant DirecTV bears the burden of proving the exemption by a preponderance of evidence. *Lederman v. Frontier Fire Protection, Inc.*, 685 F.3d 1151, 1157-58 (10th Cir. 2012). The employer must prove "both the nature of the establishment it operates and the applicability of an FLSA exemption." *Chessin v. Keystone Resort Management, Inc.*, 184 F.3d 1188, 1192 (10th Cir. 1999) (internal quotation marks and citation omitted). "Exemptions under the FLSA are to be narrowly construed against the employers seeking to assert them." *Lederman*, 685 F.3d at 1157. (internal quotation marks and citations omitted). "The inquiry into exempt status . . . remains intensely fact bound and case specific." *Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1233 (10th Cir. 2008) (internal quotation marks and citations omitted). Here, DirecTV must prove three elements:  the plaintiffs receive a regular pay rate

exceeding one and one-half times the minimum wage, the defendant employer is a retail or service establishment, and the plaintiffs receive more than half of their compensation from commissions during the representative period. *Charlot v. Ecolab, Inc.*, ---F. Supp. 3d---, 2015 WL 5774984, at *14 (E.D.N.Y. Sept. 30, 2015); *Jones v. Tucker Communications, Inc.*, 2013 WL 6072966 at *4 (M.D. Ga. Nov. 18, 2013), *appeal dismissed*, No. 13-15712 (11th Cir. Aug. 28, 2014). There is no dispute over the first element, because it is uncontroverted that the plaintiffs claim a regular rate of pay of $32.11.[2] The latter two elements are disputed.

Retail or Service Establishment

The defendant relies principally on *Jones* and *Owopetu v. Nationwide CATV Auditing Services, Inc.*, 2011 WL 4433159 (D. Vt. Sep. 21, 2011), for their analyses and conclusions that the cable and telecommunications installers are workers in a retail or service establishment. First, the plaintiffs performed services directly in the homes of the end consumers, their services were not resold, and they worked for an establishment which had 75% of its annual sales and services not connected to resale. Second, both *Jones* and *Owopetu* easily found these

---

[2] DirecTV points to the uncontroverted facts that Kari Matrai's assigned tech number was never used on any work orders and that DirecTV has no record of her completing any work orders. DirecTV contends Kari's failure to use the employer's system for tracking her work precludes her FLSA claim. The plaintiffs' response to the defendant's motion fails to address this legal argument, so it stands as uncontested.

installation services met the retail concept of work done for end users of cable and internet services.

The plaintiffs counter with three arguments. First, the defendants are unable to show that the plaintiffs worked in an industry which Congress contemplated as falling within the retail concept as evidenced by the Department of Labor's ("DOL's") listings in its regulations. Second, the defendant has not shown that its business concept is recognized as retail in the industry. The plaintiffs contend this requires expert testimony which the defendant has not properly identified in this case and which the plaintiffs have not had the chance to depose or examine or to list a proper rebuttal expert. Finally, the plaintiffs ask the court not to follow *Jones* and *Owopetu* as unpublished decisions from other district courts and as inconsistent with DOL's regulations and with case law discussing the retail concept.

Section 207(i)'s commissioned employee exemption does not define "retail or service establishment." The DOL regulations applying § 207(i) provide in part: "A retail or service establishment shall mean an establishment 75 per centum of whose annual dollar volume of sales of goods or services (or of both) is not for resale and is recognized as retail sales or services in the particular industry." 29 C.F.R. § 779.411. More explanation is found in this regulation:

> Section 7(i) was enacted to relieve an employer from the obligation of paying overtime compensation to certain employees of a retail or

service establishment paid wholly or in greater part on the basis of commissions. These employees are generally employed in so-called "big ticket" departments and those establishments or parts of establishments where commission methods of payment traditionally have been used, typically those dealing in furniture, bedding and home furnishings, floor covering, draperies, major appliances, musical instruments, radios and television, men's clothing, women's ready to wear, shoes, corsets, home insulation, and various home custom orders. There may be other segments in retailing where the proportionate amount of commission payments would be great enough for employees employed in such segments to come within the exemption. Each such situation will be examined, where exemption is claimed, to make certain the employees treated as exempt from overtime compensation under section 7(i) are properly within the statutory exclusion.

29 C.F.R. § 779.414. The Tenth Circuit has said that, "The Department of Labor regulations are entitled to judicial deference and are the primary source of guidance for determining the scope of exemptions to the FLSA." *Clements v. Serco, Inc.*, 530 F.3d 1224, 1227 (10th Cir. 2008) (internal quotation marks and citations omitted).

Some courts continue "to apply the definition contained in the repealed § 13(a)(2) of the FLSA in determining whether an employer is a retail or service establishment." *Johnson v. Wave Comm. GR. LLC*, 4 F. Supp. 3d 423, 434 (N.D.N.Y. 2014) (internal quotation marks and citations omitted), *appeal filed*, (2nd Cir. Mar. 31, 2014); *see Underwood v. NMC Mortg. Corp.*, 2009 WL 1269465 at *3 (D. Kan. 2009). And in doing so, they emphasize the regulatory framework that had supported § 13(a)(2) and the purpose behind that exemption. They look at the DOL regulation, 29 C.F.R. § 779.318, that points to a retail or service establishment as that "which sells

goods or services to the general public," serves the everyday needs of the community in which it is located," "performs a function in the business organization of the Nation which is at the very end of the stream of distribution," "sells to the general public its . . . radios . . ., and performs incidental services on such goods when necessary," and "provides the general public its repair services and other services for the comfort and convenience of such public in the course of its daily living." They also consider the regulations that offer partial listings of those establishments that lack a "retail concept," 29 C.F.R. § 779.317, and those establishments that "may be recognized as retail," 29 C.F.R. § 779. 320. *See Underwood*, 2009 WL 1269465 at * 4-*6.

The Seventh Circuit recently discussed this approach of a borrowed definition and borrowed regulations and found the exemption at § 13(a)(2) to serve a purpose different from § 7(i) and rejected the "wooden[]" importation of § 13(a)(2) regulations and holdings "to the commission exemption with no sensitivity to the very different purpose of that exemption." *Alvarado v. Corporate Cleaning Services, Inc.*, 782 F.3d 365, 371 (7th Cir. 2015). The court in *Alvarado* observed that the definitions and the regulatory scheme associated with the intrastate business exemption in § 13(a)(2) are consistent with "Congress's purpose . . . to exempt local mom and pop stores from wide-sweeping federal labor legislation (and not just from the overtime requirement)." *Id*. For this

reason, "courts would want to ensure that most of the local stores' output would remain within the state—in other words that they are operating on a small scale in the community." *Id*. The Seventh Circuit found that "Chicago's largest provider of window-washing services to high-rise commercial and apartment buildings" was "best described as a retail service establishment" which sold its services to "the ultimate consumers" and did not act as a wholesaler in having its services resold. 782 F.3d at 366, 369. As for the purpose of the commission exemption, the court highlighted, "that commission-compensated work involves irregular hours of work," 782 F.3d at 368, and that "when demand [for services] drops the seller cannot make up for it, as a maker of goods can do, by producing for inventory rather than for immediate sale," 782 F.3d at 369. Not only is the reasoning in *Alvarado* persuasive, but it upholds and furthers the distinct purpose of the commission exemption. It also avoids the legal gymnastics of finding some defensibly analogous or comparable match with the retail establishment listings in the regulations applying § 13(a)(2).

The court is satisfied that DirecTV meets § 7(i)'s requirement of a "retail or service establishment" as it was understood and applied in *Alvarado*. DirecTV is selling an everyday service delivered through sophisticated equipment installed in the retail consumers' homes. As demand drops for installing and repairing the sophisticated equipment, DirecTV cannot make up for it by using the installers to make more product

like a manufacturer would. *See Alvarado*, 782 F.3d at 369. DirecTV sells its services to the ultimate customers, and the equipment is installed and serviced in the customers' homes and they do not resell these services or equipment. *Id*. The purpose of this exemption appears to be served in covering DirecTV's use of commissioned installers.

The court also is convinced that DirecTV meets the definition of a "retail or service establishment" based on judicial deference to the DOL's regulations as a guide in applying this exemption. The regulation expressly addressing this element in § 7(i) defines the establishment as not providing most goods or services for resale and as being recognized as providing retail services in the industry. § 779.411. There is no dispute here that DirecTV's use of technicians to install and setup satellite televisions systems in customers' homes does not involve the resale of goods or services. *See Jones¸*2013 WL 6072966 at *6. As for the second element, courts have extracted from the regulations a two-part test:  a "retail concept" exists in the defendant's industry and the particular services are recognized as being retail within the industry. *Charlot*, ---F. Supp. 3d---, 2015 WL 5774984, at 32; *Rodriguez v. Home Heroes, LLC*, 2015 WL 668009, at *7 (M.D. Fla. Feb. 17, 2015); *Johnson*, 4 F. Supp. 3d at 436; *Jones*, 2013 WL 6072966 at *9; *Owopetu*, 2011 WL 4433159, at *4.

Relying on the regulatory listings, the plaintiffs argue that DirecTV lacks a "retail concept" by analogizing the installation of satellite

television systems to non-exempt contractors' work and by analogizing the satellite television service to non-exempt public utility companies, notwithstanding that these industries provided services to end consumers. The plaintiffs conclude that, "a common sense analysis of the defendant's business inevitably leads to the conclusion that defendant's business is not retail, as Defendant's business is primarily installation and service." (Dk. 75, p. 39).

As the Seventh Circuit observed in *Alvarado*, these listings offer "no explanation for the choice of which firms to describe as lacking a retail concept." 782 F.3d at 370. Analogizing amounts to little more than speculative reasoning when the rationale for the listing is neither obvious nor stated. Between these regulatory listings is 29 C.F.R. § 779.318 which offers some definitional structure to this retail concept as "selling the services to the general public, serving the everyday needs of the community, and performing a function at the very end of the stream of distribution." *Jones*, 2013 WL 6072966 at *7. Installers and repairers of DirecTV systems are part of the provision of such services to DirecTV customers which includes the monthly satellite television services. Additionally, the technicians are providing the general public "repair services and other service for the comfort and convenience of the public in the course of its daily living." § 779.318. In a recent FLSA case involving this same exemption claimed against installers of cable television services, the court observed:

It is noted that in several cases, including one in this Circuit, the "retail concept" of businesses nearly identical to Wave Comm's has not even been at issue. *See Moore v. Advanced Cable Contractors, Inc.*, No. 1:12–CV–00115, 2013 WL 3991966, at *3 (N.D. Ga. Aug. 1, 2013) ("Defendants assert, and Plaintiffs do not dispute, that Advanced Cable is a retail and service establishment for the purposes of the FLSA."); *Owopetu II*, 2011 WL 4433159, at *4 ("[Plaintiff] does not dispute that the industry of servicing, installing, and repairing cable and broadband equipment has a 'retail concept.' "); *Gruchy v. DirecTech Del., Inc.*, No. 08–10755, 2010 WL 3835007, at *2 (D. Mass. Sept. 30, 2010) (noting there was no dispute that company who performed similar services for a satellite television provider was a retail or service establishment); *Horn v. Digital Cable & Commc'ns, Inc.*, No. 1:06 CV 325, 2009 WL 4042407, at *4 (N.D. Ohio Feb. 11, 2009) (noting defendant cable installation company put forth undisputed evidence that it qualified as a retail or service establishment).

*Johnson*, 4 F. Supp. 3d at 437. In these cases and in *Jones*, the courts discussed and assumed the actual cable television providers were retail in nature. *Id.; Jones*, 2013 WL 6072966 at *7. The Matrais provided installation and repair services on behalf of DirecTV directly to the end consumers for their comfort and convenience in receiving the daily services of DirecTV. The provision of satellite television services and the installation and repair of the same "meet the everyday needs of the community." *Jones*, 2013 WL 6072966.

The plaintiffs liken themselves to contractors doing construction work like plumbing, roofing, painting, siding or insulation, and they do so by comparing the work. Unlike contractors who performed one part of a construction project, the plaintiffs installed, set up, connected, serviced, repaired, and even upgraded the satellite television system so as to be operational in the consumer's home. The court agrees with the conclusion in

*Johnson* that plaintiffs' work is more "appropriately classified as members of the telecommunications industry, an industry with a retail concept, and not the construction industry, an industry lacking a retail concept." 4 F. Supp. 3d at 439; *see Jones*, 2013 WL 6072966, at *8. The court also rejects the plaintiffs' effort to compare DirecTV to a large public utility which the regulations list as non-exempt. (Dk. 75, p. 38). As the Seventh Circuit observed in *Alvarado*, the retail and service establishment and regulations for the repealed § 213(a)(2) were concerned with exempting mom and pop stores that operated "on a small scale in the community." 782 F.3d at 371. The § 7(i) exemption, however, "focuses on the employee's compensation rather than the employer's business plan." *Owopetu*, 2011 WL 4433159 at *6 (internal quotation marks and citation omitted). Thus, the size or business plan of the employer should not impact the § 7(i) exemption as it may have impacted the § 13(a)(2) exemption. *Alvarado v. Corporate Cleaning Service, Inc.*, 719 F. Supp. 2d 935, 945 (N.D. Ill. 2010), *aff'd*, 782 F.3d 365 (7th Cir. 2015). Between the summary judgment record and the leading case law on this issue, the court finds that DirecTV as a provider of consumer satellite services and equipment has a retail concept.

On the issue of whether the installation and repair of the satellite equipment in consumers' homes is recognized as retail in the satellite television industry, the court finds no serious dispute over this conclusion. It is undisputed that the Matrais were completing work orders for the

installation of satellite television equipment purchased in a retail transaction. The consumers had purchased the installation services as part of a retail package of equipment and services. The Matrais provided installation and repair services in connection with a retail product for the comfort, convenience and enjoyment of the retail purchasers. *See Johnson*, 4 F. Supp. 3d at 440-41; *Jones*, 2013 WL 6072966, at \*9-\*10; *Owopetu*, 2011 WL 4433159 at \*5. The retail character of DirecTV's services and of Matrais' work in installing, setting up, and maintaining these services is apparent and does not present any genuine issue for trial. The plaintiffs have not come forward with any triable issues of material fact on this question. The record allows the court to conclude that DirecTV is a retail or service establishment for purposes of the § 7(i) exemption.

Paid Commissions

The § 7(i) exemption requires the plaintiffs receive more than half of their compensation from commissions during the representative period. Relying on the reasoning in *Jones* and *Owopetu*, the defendant argues the plaintiffs were paid an established amount for a service and the compensation paid was not affected by how long it took the Matrais to complete the service. The defendant describes the compensation as incentive-based commissions which encouraged the Matrais to work more efficiently in order to complete the work orders so they could take additional orders that came in during the same day.

The plaintiffs rely on *Wilks v. Pep Boys*, 2006 WL 2821700 (M.D. Tenn. Sep. 26, 2006), *aff'd*, 278 Fed. Appx. 488 (6th Cir. 2008), in arguing that a commission-based system must be tied to the cost charged the consumer and that there is no evidence of any relationship between the flat-rates paid them for services and the charges assessed to DirecTV's consumers. The plaintiffs characterize their pay as piecework compensation because there is no evidence of proportionality between the compensation and the customer charges. The plaintiffs also dispute that the compensation system was an incentive for them to do more work orders, "because some jobs took longer than others and the payment scheme did not account for specific difficulties on job sites or travel time to the particular job site." (Dk. 75, p. 42). Thus, more hours did not always mean more money.

In reply, the defendant points to the evidence of record showing the Matrais were paid for completed installations of purchased equipment and services, *i.e.*, a consummated sale. The rate of pay per installation varied with such factors as the number of rooms and outlets, upgrades and protection plans and whether the Matrais sold the customers additional products during the installation. The rate of pay, however, did not depend on the amount of time that the plaintiffs took in completing the work order and sale. It is also uncontroverted that DirecTV issued additional work orders during the day, and these orders offered the same compensation potential as all other work orders. Thus, installers, like the Matrais, could ask for and

perform these additional work orders and expect to earn more compensation.

A definition of "commission" is not found in the FLSA. *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 278 (3rd Cir. 2010). A DOL regulation offers this on what a commission is not:

> (c) A commission rate is not bona fide if the formula for computing the commissions is such that the employee, in fact, always or almost always earns the same fixed amount of compensation for each workweek (as would be the case where the computed commissions seldom or never equal or exceed the amount of the draw or guarantee). Another example of a commission plan which would not be considered as bona fide is one in which the employee receives a regular payment constituting nearly his entire earnings which is expressed in terms of a percentage of the sales which the establishment or department can always be expected to make with only a slight addition to his wages based upon a greatly reduced percentage applied to the sales above the expected quota.

29 C.F.R. § 779.416. The Third Circuit in *Parker* discussed opinion letters issued by DOL's Wage and Hour Division and found in them the propositions that flat fees paid for alarm system installations were not commissions but were compensations based on a piecework basis, because they lacked any "connection to the cost to the consumer," but that automobile painters paid per automobile regardless of time taken to complete the job were under a commission system as the painters were "encouraged to work rapidly and efficiently" and received pay that "varied from week to week" and that appeared "to be related to the value of the service performed." *Id.* at 280-81.

In *Alvarado*, the window washers were paid per job on a point system "based on the job's complexity and the estimated number of hours that the window washers will take to complete it." 782 F.3d at 366-67. The points assigned to the job affected the prices charged the customer *Id.* at 367. In concluding this was a commission, the Seventh Circuit made the following points:

> There are real differences between the two compensation systems (commission and piecework), and the reality, which overcomes the nomenclature, is that CCS's system is a commission system. In a piece-rate system a worker is paid by the item produced by him: so much per scarf, for example, if his job is to make scarves. In a commission system he is paid by the sale—so if he works for a shoe store he's paid a specified amount per pair of shoes that he sells. Thus the scarf worker is paid for making scarves even if they haven't been sold—that is, even if he's producing for inventory—while the shoe salesman is paid only when he makes a sale. In the present case, as in the shoe-store example, the window washers are paid only if there's been a sale, namely a sale of window-washing service to a building owner or manager.
>
> The parties' briefs spill much ink over whether a commission system requires that the compensation bear an "identifiable and consistent correlation" to the price charged to customers or that the compensation just be "proportional and correlated" to the price. The plaintiffs urge the former, the defendant the latter, as the latter is a more accurate description of CCS's compensation system. Our decision in *Yi*, cited earlier, which involved auto repair, supports CCS's position. As in this case, the employer in *Yi* made adjustments to the price of its service for such things as differences in costs of materials used. The adjustments made the percentage of the price attributable to its auto mechanics' compensation vary from repair to repair. We held that this didn't invalidate the compensation system as a commission system. *Yi v. Sterling Collision Centers*, Inc., supra, 480 F.3d at 509–10. The Third Circuit agreed. *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 283 (3d Cir. 2010) ("we decline to adopt a test that requires a commission, under § [20]7(i), to be strictly based on a percentage of the end cost to the consumer"). We are unaware of any contrary authority.
> A more important consideration is that commission-compensated work involves irregular hours of work. *See Yi v. Sterling Collision Centers,*

*Inc.*, *supra*, 480 F.3d at 510; *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1176–77 (7th Cir. 1987); *Gieg v. DDR, Inc.*, 407 F.3d 1038, 1045–46 (9th Cir. 2005). An employee who is paid by the sale is not a commission worker if his sales are made at a uniform rate (e.g., one sale per hour), so that the ratio of his hours worked to his pay is constant. For in that case his pay is effectively hourly. That's why piece-rate workers are not within the commission exception: because they keep producing even when no sale is imminent, the relation between the hours they work and their output tends to be constant. But CCS's employees can work only when CCS is hired to wash a building's windows.

782 F.3d at 367-68. Simply put, a commission system pays employees upon a sale, at a rate that is related to the price of the sale, and for work involving irregular hours. The evidence of record establishes all three indicators here of a commission system of compensation.

The Matrais were paid only for completed sales in which they installed the purchased equipment and services. The Matrais were paid at a rate that varied with such factors as the number of rooms or outlets, upgrades, and purchase plans. (Dk. 80-1, Ex. 10, p. 39). There is no serious dispute that these same factors were necessarily reflected in the sales prices charged the customers. Thus, the Matrais' rate of pay fluctuated by job with the value of the services they performed (*i.e.*, number of rooms, outlets and receivers) and with the additional items they sold (upgrades and protection plans). (Dk. 68, Ex. 3, Kari Matrai Dep. p. 35; Dk. 80-1, Ex. 10). DirecTV's use of commissioned installers to deliver, customize and install television services in customers' homes resembles the intended scope of § 207(i) discussed in § 779.414 to cover "those establishments or parts of

establishments where commission methods of payment traditionally have been used" which includes, "home custom orders."

Their rate of pay did not depend on the actual time it took them to complete the work order. The more jobs the Matrais completed in a day, the more they were paid. Thus, installers wanting to make more money had the incentive to do their work efficiently and effectively as to do more jobs in a day and to take additional work orders that became available during the day. The Matrais worked irregular hours. While the Matrais were expected to handle at least three jobs a day, some days they had more jobs and some days they had only one or two jobs. (Dk. 68, Ex. 5, Kenny Matrai Dep. p. 56). Jobs were scheduled between 8 am and 4pm during winter months and between 8 am and 8 pm during summer months. (Dk. 68, Ex. 3, Kari Matrai Dep. p. 102). In sum, the court is satisfied the evidence of record here sufficiently shows the indicators of a commission system of compensation as discussed in *Parker*, *Alvarado* and *Jones* are present. *See also Moore v. Advanced Cable Contractors, Inc.*, 2013 WL 3991966 (N.D. Ga. Aug. 1, 2013); *Owopetu v. Nationwide CATV Auditing Services, Inc.*, 2011 WL 883703 (D. Vt. Mar. 11, 2011).

The court concludes that DirecTV has carried its burden of showing the retail or service establishment exemption is met and that DirecTV is exempt from paying overtime compensation pursuant to 29 U.S.C. § 207(i).

IT IS THEREFORE ORDERED that the plaintiffs Kari and Kenny Matrai's motion for partial summary judgment (Dk. 70) is denied, and the defendant DirecTV's motion for summary judgment (Dk. 67) is granted.

Dated this 4th day of March, 2016, Topeka, Kansas.

s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge